UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1489

IN RE PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE

Debtor.

EDWARD KAUFMAN, ET AL.,

Defendants, Appellants,

v.

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, ET AL.,

Plaintiffs, Appellees.

ERRATA SHEET

The opinion of this Court, issued on January 6, 1995, is
amended as follows:

In case title on cover sheet, replace "Plaintiffs,
Appellants," with "Defendants, Appellants," and "Defendants
Appellees," with "Plaintiffs, Appellees,". 

January 9, 1995 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1489

IN RE PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE

Debtor.

EDWARD KAUFMAN, ET AL.,

Defendants, Appellants,

v.

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, ET AL.,

Plaintiffs, Appellees.

ERRATA SHEET

The opinion of this Court, issued on January 6, 1995, is
amended as follows:

On cover sheet, replace [Hon. Ronald R. Lagueux,* U.S.
District Judge]" with "[Hon. Ernest C. Torres,* U.S. District
Judge]". Footnote should remain the same. 

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1489
IN RE PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE,

Debtor.

EDWARD KAUFMAN, ET AL.,
Defendants, Appellants,

v.
PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, ET AL.,

Plaintiffs, Appellees.
,

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Ernest C. Torres,* U.S. District Judge]

Before
Selya, Circuit Judge,

Aldrich, Senior Circuit Judge,
and Boudin, Circuit Judge.

Robert C. Richards for appellants.
Wynn E. Arnold, Assistant Attorney General, Civil Bureau, with
whom Jeffrey R. Howard, Attorney General, was on brief for appellee
State of New Hampshire.
John B. Nolan with whom Steven M. Greenspan, Lorenzo Mendizabal,
Gary M. Becker, Day, Berry & Howard, Howard J. Berman and Greenberg,
Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A. were on brief for
appellees Public Service Company of New Hampshire and The Official
Committee of Equity Security Holders.

January 6, 1995

*Of the District of Rhode Island, sitting by designation.

BOUDIN, Circuit Judge. On this appeal, the appellants--

Edward Kaufman, Robert Richards, and Martin Rochman--

challenge an injunctive order issued by the federal

bankruptcy court in New Hampshire, and affirmed by the

district court. That order enjoined appellants from bringing

a securities fraud suit against the Public Service Company of

New Hampshire ("Public Service"), its committee of equity

security holders, the State of New Hampshire, and others. We

affirm.

I. BACKGROUND

The appellants in this case were common stockholders of

Public Service, a New Hampshire public utility. In the

1980s, Public Service owned a nuclear power plant under

construction in Seabrook, New Hampshire. Due to the Seabrook

project, Public Service experienced severe financial problems

and filed for Chapter 11 bankruptcy on January 28, 1988. The

details of the bankruptcy proceeding are recounted in the

opinion of the bankruptcy court in this case, In re Public

Service Co., 148 B.R. 702, 703-09 (Bankr. D.N.H. 1992), and

we confine ourselves to a brief overview.

In 1989, Public Service, its committee of equity

security holders and a committee representing its unsecured

creditors filed with the bankruptcy court a comprehensive

plan of reorganization. 11 U.S.C. 1125. In accordance

with that section, the plan was accompanied by a disclosure

-2- -2-

statement, to be used in soliciting the plan's acceptance by

holders of claims and interests, see 11 U.S.C. 1126, that

described the nature and consequences of the plan. Over the

appellants' objections, the disclosure statement was approved

by the bankruptcy court on January 3, 1990. 11 U.S.C.

1125(b). Public Service's plan of reorganization was

confirmed on April 20, 1990, after six days of hearings

largely devoted to the appellants' objections. 11 U.S.C.

1128-29.

The plan was to be implemented in two stages, each one

contingent on approval by regulatory agencies. The first

step--reorganization of Public Service with certain

distributions to its owners and creditors--was to take effect

only if the New Hampshire Public Utilities Commission

approved the plan's provisions regarding new utility rates

for Public Service. See 11 U.S.C. 1129(a)(6). That

approval was forthcoming, a court challenge to the agency

approval by appellants failed, Appeal of Richards, 590 A.2d

586 (N.H.), cert. denied, 112 S. Ct. 225 (1991), and the

reorganization occurred on May 16, 1991.1

The second stage effected a merger of Public Service

with a subsidiary of Northeast Utilities, a Connecticut



1Appellants also sought unsuccessfully to challenge the
confirmation itself in the district court, in this court and
in the Supreme Court. See In re Public Service Company of
New Hampshire, 963 F.2d 469 (1st Cir. 1992), cert. denied,
113 S. Ct. 304 (1992).

-3- -3-

utility company selected as the winning bidder for Public

Service through a competitive bidding process provided for in

the plan. The merger was conditioned on the approval of the

Federal Energy Regulatory Commission. That approval was also

secured, despite an unsuccessful attempt at intervention by

appellants in the FERC proceeding, and the merger took place

on June 5, 1992.

At various stages in the bankruptcy proceeding,

appellants contended that the proponents of the plan had made

false and misleading representations in the disclosure

statement. After the confirmation but before the

reorganization or merger, appellants filed a motion in

January 1991 to revoke the order approving confirmation on

the ground that it had been procured by fraud. The request

was dismissed on the ground that it was time barred under 11

U.S.C. 1144, which permits reopening for fraud only if

sought within 180 days of confirmation.

After the plan was confirmed and largely implemented,

Richards--who is also the attorney for the appellants--wrote

a letter in March 1992 to counsel for various proponents of

the plan, revealing that he intended shortly to begin a class

action in the district court for the Southern District of New

York. Pertinently, the enclosed draft complaint accused

private plan proponents and the State of New Hampshire of

violations of federal securities laws, 15 U.S.C. 78, and of

-4- -4-

common law fraud, based on supposed misrepresentations in the

bankruptcy-court disclosure statement.

Public Service, its committee of equity security

holders, and the State of New Hampshire promptly brought an

adversary proceeding in the bankruptcy court to enjoin the

appellants from commencing the threatened action. After

granting interim relief, that court in November 1992 granted

the injunction. Public Serv. Co. v. Richards, 148 B.R. 702

(1992). The injunction barred any future civil action by

appellants challenging the bankruptcy court disclosure

statement, the confirmation order or the solicitation of

acceptance. The district court affirmed the injunction.

Kaufman, Richards and Rochman appeal.

Despite the injunction, in late November 1992 Richards,

acting as the attorney for yet another Public Service

stockholder, did commence the threatened fraud action against

several private appellees, but not against the State of New

Hampshire, in the Southern District of New York. The

bankruptcy court found Richards in contempt but imposed no

sanction; the district court for the Southern District of New

York thereafter dismissed the complaint without prejudice.

Richards has not sought review of the contempt order in this

court, and we are therefore concerned only with the

injunction.

II. DISCUSSION

-5- -5-

On this appeal the appellants do not challenge the

authority of the bankruptcy court to enjoin a collateral

attack on its orders and proceedings. See generally Local

Loan Co. v. Hunt, 292 U.S. 234 (1934). Instead, they attack

the injunction on the merits, arguing that neither the safe

harbor provision of the Bankruptcy Code nor res judicata

principles forestall the subsequent fraud action in the

Southern District of New York. These were the principal

bases for the injunction issued by the bankruptcy court,

although it also held that a suit against New Hampshire was

barred by the Eleventh Amendment.

The Bankruptcy Code provides that a chapter 11

reorganization may be voted upon by holders of claims and

interests, based on a disclosure statement approved by the

court after notice, hearing and a determination that the

statement contains adequate information. 11 U.S.C.

1125(b), 1126. The adequacy of the disclosure statement is

determined under the Bankruptcy Code and "is not governed by

any otherwise applicable nonbankruptcy law, rule, or

regulation . . . ." 11 U.S.C. 1125(d). The safe harbor

provision, 11 U.S.C. 1125(e), then states:

A person that solicits acceptance or
rejection of a plan, in good faith and in
compliance with the applicable provisions
of this title, or that participates, in
good faith and in compliance with the
applicable provisions of this title, in
the offer, issuance, sale, or purchase of
a security, offered or sold under the

-6- -6-

plan, of the debtor, of an affiliate
participating in a joint plan with the
debtor, or of a newly organized successor
to the debtor under the plan, is not
liable, on account of such solicitation
or participation, for violation of any
applicable law, rule, or regulation
governing solicitation of acceptance or
rejection of a plan or the offer,
issuance, sale, or purchase of
securities.

The Bankruptcy Code provides further that the plan

cannot be confirmed by the court unless, inter alia, the plan

has been proposed "in good faith and not by any means

forbidden by law." 11 U.S.C. 1129(a)(3). If a plan is

confirmed after the necessary vote, the confirmation may be

revoked only if, within 180 days after confirmation, a party

in interest so requests and the court thereafter finds that

the confirmation order was "procured by fraud." 11 U.S.C.

1144. These provisions are the framework for the present

dispute.

The heart of the appellants' fraud complaint filed in

the Southern District of New York was a two-pronged attack on

the disclosure statement used in the reorganization of Public

Service. The first prong challenged the disclosure

statement's description of the authority of the New Hampshire

Public Service Commission to impose unfavorable rates on

Public Service if the reorganization failed. This

contingency was pertinent to the plan's approval because the

treatment of the Seabrook investment was in dispute and the

-7- -7-

plan embodied a negotiated compromise on utility rates to

forestall litigation. See 11 U.S.C. 1129(b)(6).

The disclosure statement contained some general

statements about the power of a utility commission to refuse

to include in the utility's rate base imprudent investment--

an issue of central importance in relation to Seabrook--and

to temper any required rate increase (e.g., by using a phase

in) to avoid "rate shock" to customers. Appellants' theory

in their complaint was that the disclosure painted too

pessimistic a picture of the legal rules that would constrain

Public Service rate increases if the reorganization were

rejected and the rate level had to be litigated in court.

The second prong of the attack on the disclosure

statement concerned the merger of Public Service into a

subsidiary of Northeast Utilities. The disclosure statement

offered ranges of projected value for the common and

preferred stockholders of Public Service, assuming (in the

alternative) that the second-phase merger were or were not to

be approved. Not surprisingly, the "with" merger assumption

generated slightly higher values. The appellants say that

without the merger Public Service might have collapsed, the

stockholders would have been far worse off, and therefore the

stockholders were not adequately warned of a material threat

of financial harm. (The merger, of course, did occur).

-8- -8-

Appellants also say that the small differential between

the "with" and "without" merger projections concealed the

vast benefit that the merger synergies would provide to the

new owner. If the Public Service stockholders had known of

these benefits, say appellants, they might well have demanded

a greater share and rejected the proposed plan. To show that

there was a threat that Public Service would collapse absent

the merger, and that great synergies would be achieved from

it, appellants point to several statements to this effect by

the regulatory agencies that ultimately considered the

merger.

Few public utility lawyers would be greatly disturbed by

the description of state agency powers given in the

disclosure statement; although there is plenty of room for

disagreement about nuance, the suggestion of fraud in this

respect is very far-fetched. As for the financial

projections, the complaint does not even begin to show that

they were wrong, let alone fraudulent; at most, it asserts

some inconsistency with later agency appraisals. Still, we

are not concerned here with a motion to dismiss and will

assume arguendo (albeit with a good deal of skepticism) that

we are dealing with a serious, although entirely unproven,

fraud complaint.

If we were faced with a case of what the bankruptcy

judge called "secret fraud," appellants might have an

-9- -9-

arguable basis for their collateral attack. True, section

1125(d) could be read very broadly to make any fraud claim

disappear since that section provides that the adequacy of a

disclosure statement is "not governed by any otherwise

applicable nonbankruptcy law." On the other hand, one may

doubt that Congress meant in all circumstances to wipe out

every damage remedy against a defrauder who managed to

deceive everyone, including the bankruptcy court. The very

existence of the safe harbor provision suggests otherwise.

Similarly, the safe harbor provision presents puzzles of

its own. On its face, it immunizes only good faith

"solicit[ations]" for approval or rejection and

"participat[ion]" in securities transactions; it says nothing

explicit about false disclosure statements; even if read more

broadly, as is likely justified, it does not protect bad

faith conduct. Nor does it say where and how good faith is

to be determined; the bankruptcy court did make good faith

findings in approving the plan, but (as we explain below)

their significance is itself open to dispute.

In our view--and we have little precedent to guide us--

this case can be disposed of based on a single, relatively

narrow circumstance: the attacks now made on the disclosure

statement were in part made in the reorganization proceeding

itself; and, to the extent that they were not made there,

-10- -10-

they could and (if meritorious) should have been made

there.2 It is this circumstance that led the bankruptcy

judge to distinguish the possibility of "secret fraud," that

is to say, fraud of such a character that it could not

reasonably be uncovered until after the confirmation.

There is no secret fraud here. The description of state

utility commission powers not only could have been disputed

during the approval of the disclosure statement but was in

fact challenged by appellants. As for the financial

projections, they were open to attack at the same time, and

appellants point to nothing in the way of newly discovered

evidence that could explain why the criticisms now made could

not have been litigated at the time. To refer summarily to a

couple of conclusory statements from regulators about the

need for, or benefits of, the merger does not remotely

justify the delay.

The bankruptcy judge found, in issuing the injunction,

that the appellants "did raise or had the opportunity to

raise" in the reorganization all of the issues that they now

seek to litigate. 148 B.R. at 718. It is implicit in this

finding that the appellants by exercising due diligence could



2Yell Forestry Products, Inc. v. First State Bank, 853
F.2d 582 (8th Cir. 1988) may represent the closest authority
in point. We agree with appellants that it is
distinguishable on its facts but believe that it comports
with our own view that the courts have authority to fashion
appropriate limitations on collateral attacks while reserving
the possibility that in some cases they may be justified.

-11- -11-

have learned enough to raise their present contentions in

opposing confirmation.3 The appellants do not even attempt

to undermine the finding, but blandly assert that they had

"no obligation" to discover that they had been "lied to." In

this context appellants are mistaken.

Because the alleged inaccuracies could have been, and in

part were, litigated in the bankruptcy court, we think that

court was entitled to prohibit a new (albeit indirect) attack

upon the disclosure statement it had approved. Whether or

not such an attack is literally forbidden by either section

1125(d) or section 1125(e) is debatable; but against the

background of these provisions, and the policies of chapter

11, we think it evident that allowing such an attack would

disrupt Congress' detailed scheme for approval of disclosure

statements and reorganizations, and would frustrate the

proper administration of the Bankruptcy Code.

If there are substantial errors in a disclosure

statement, the opponents in the reorganization have every

incentive to raise them while the disclosure statement or

proposed plan can still be modified; the statute itself

points to the importance of a single, definitive approval

process. E.g., 11 U.S.C. 1125-26. Conversely, putting to



3The bankruptcy court made this clear by reserving the
possibility of a post-reorganization fraud suit based on
"secret fraud," 148 B.R. at 720, which we take to mean fraud
that a plan opponent could not reasonably have discovered at
the time of the reorganization. Id.

-12- -12-

one side the possibility of secret fraud, the Bankruptcy Code

looks not only toward repose for a confirmed plan, 11 U.S.C.

1144, but toward protecting those who have participated in

the development of execution of the plan. See 11 U.S.C. 

1125(d), (e); H. Rep. No. 595, 95th Cong., 2d Sess. 236

(1978).

In acting to protect its prior proceedings, the

bankruptcy court acts in an equitable capacity. Later suits

that threaten to undermine a bankruptcy judgment are not

merely the concern of the individual litigants; the

willingness of future claimants and creditors to compromise

in chapter 11 proceedings depends on giving the

reorganization court's approval a due measure of finality.

And in determining how much finality is due, equitable

considerations and policy concerns can properly justify

results that are not literally compelled by statutory

language.

Absent substantial new evidence of fraud, there is no

reason why Congress would have wished, or the courts should

permit, participants who actively participated in the

reorganization to relitigate in later civil actions

previously raised issues about the adequacy of the disclosure

statement, or to reserve for such actions claims that

feasibly could have been made in the reorganization. The

courts have ample authority to infer restrictions necessary

-13- -13-

to make Congress' plan work. Cf. Yell Forestry Products, 853

F.2d at 584. The restriction inferred in this case is both

narrow and--as the facts of this case illustrate--amply

justified.

Res judicata principles were the subject of discussion

by the bankruptcy and district courts and of extensive

briefing in this court, so it may be helpful to explain why

we have chosen not to pursue this line of reasoning. It is

quite true, as appellees assert, that the bankruptcy court

did in confirming the plan make explicit findings that the

plan was proposed, and its acceptance was solicited, in good

faith. See 148 B.R. at 707. The latter finding dovetails

with the good faith requirement that triggers safe harbor

protection for the private appellees, and might at first

glance seem to resolve the case against them.4

But the res judicata argument leads into a briar patch

of problems. Putting aside the appellants' doubtful claim

that the good faith finding in question was not "necessary"

to the result, the appellants argue that collateral estoppel

should not apply because mootness prevented them from

obtaining review of the confirmation in this court. See In

re Public Service Company of New Hampshire, 963 F.2d at 471-



4The State of New Hampshire is not covered by the safe
harbor provision--not being a "person" under chapter 11, 11
U.S.C. 101(41)--although appellants have never explained
why they think that the state is responsible for any mistakes
in the disclosure statement.

-14- -14-

75. The appellees respond that mootness was caused by

appellants' failure to seek a stay of the reorganization

while appealing the confirmation. Appellants say they could

not afford the bond.

Even if we resolved these issues in favor of appellees,

which we might well do, there is a further more basic problem

in invoking collateral estoppel. If we were dealing with a

true case of secret fraud, the same concealment that was the

gravamen of the collateral attack would likely have

constituted a fraud on the reorganization court itself. This

would not vitiate the confirmation order, unless challenged

within 180 days, 11 U.S.C. 1144, but it would raise very

serious concerns about giving collateral estoppel effect to

any finding of good faith that rested upon the same

fraudulent concealment. See Restatement (Second), Judgments

28(5)(c), 70 (limitations on later use of judgment

procured by fraud).

We are not saying that the collateral estoppel defense

is entirely circular; but if appellees had fraudulently

concealed critical information from the reorganization court,

it is not clear that merely pointing to a prior good faith

finding by the same court (made in the same state of

ignorance) would resolve the matter. By contrast, the route

we follow to affirmance--that appellants could and should

have litigated their inaccuracy claims in the reorganization

-15- -15-

forum--does not depend on any prior good faith findings by

the reorganization court but on what we see before us today.

Our determination also does not depend on the literal

language of the safe harbor provision but on the broader

policies of chapter 11 and on considerations of equity. The

determination therefore applies with equal force to

comparable claims against the State of New Hampshire and its

officials, even though the state itself is technically not

covered by section 1125(e). We have no occasion to consider

the Eleventh Amendment defense that the bankruptcy court

adopted as an alternative ground for precluding suit against

the state.

III. CONCLUSION

The bankruptcy court was forebearing in its decision not

to punish the apparent contempt of its injunction. It would

be unwise for appellants to take our present decision as an

invitation to invent new collateral attacks on the

reorganization plan that purport to skirt the injunction.

Litigation is a device for settling disputes, not for

prolonging them to the point of abuse. Cf. Fed. R. Civ. P.

11.

Affirmed.

-16- -16-